

# NUMBER 13-19-00311-CV

# COURT OF APPEALS

# THIRTEENTH DISTRICT OF TEXAS

# CORPUS CHRISTI – EDINBURG

CITY OF BROWNSVILLE, TEXAS,
TONY MARTINEZ, ROSE M. Z. GOWEN,
RICARDO LONGORIA JR., JOEL MUNGIA,
BEN NEECE AND JESSICA TETREAU,
IN THEIR OFFICIAL CAPACITIES ONLY,                    Appellants,

v.

BROWNSVILLE GMS, LTD. AND
MICHAEL BENNETT,                                      Appellees.

On appeal from the 445th District Court
of Cameron County, Texas.

## DISSENTING MEMORANDUM OPINION

**Before Justices Benavides, Hinojosa, and Tijerina**
**Dissenting Memorandum Opinion by Justice Benavides**

I respectfully dissent because the majority incorrectly applies the standard of

review for a temporary injunction and because the majority erroneously interprets

statutory causes of action provided by the Texas Local Government Code and the Texas Government Code, thereby rendering them meaningless. *See* TEX. LOC. GOV'T CODE ANN. § 252.061 (providing a cause of action for statutory violations regarding the purchasing and contracting authority of municipalities); TEX. GOV'T CODE ANN. § 551.142(a) (providing a cause of action for statutory violations regarding open meeting requirements).

In contrast to the majority opinion, I would affirm the temporary injunction in part and reverse and remand in part as further discussed below. In short, I believe there is sufficient evidence to conclude that GMS had a probable right to recover on its causes of action for violations of Chapter 252 of the local government code and the Texas Open Meetings Act (TOMA). Because I have reached this conclusion, I review, of necessity, the five issues raised by appellants that are not addressed by the majority opinion. *See* TEX. R. APP. P. 47.1.

## I.   BACKGROUND

The majority opinion's presentation of the background for this appeal is accurate but limited insofar as it fails to include a complete discussion of the evidence supporting the trial court's exercise of discretion in granting the temporary injunction. The majority further omits the factual and procedural background relevant to the five issues it does not address.

Appellants raise seven issues through which they assert that the assigned judge erred in granting a temporary injunction because: (1) they had objected to the assigned judge, who was thus disqualified from presiding over the case and entering the temporary injunction; (2) the underlying temporary restraining order was improperly entered; (3) GMS failed to establish the necessary elements to obtain a temporary injunction; (4) the

2

temporary injunction creates an undue hardship; (5) the relief granted exceeds the relief sought by GMS; (6) GMS had unclean hands; and (7) the injunctive relief order is defective. The majority performs a truncated review of the issue on which its opinion turns, that is, appellants' third issue alleging that GMS failed to establish the necessary elements to obtain a temporary injunction. Because I believe that review is incomplete, I provide a separate summation of the factual and procedural background relevant to the third issue.

On May 6, 2019, GMS filed "Plaintiff's Verified Original Petition and Application for Temporary Restraining Order and Temporary Injunction." In this pleading, GMS contended that the City committed multiple violations of a competitive procurement process under Chapter 252 of the Texas Local Government Code and violated TOMA. *See* TEX. LOC. GOV'T CODE ANN. §§ 252.001–.063 (delineating the purchasing and contracting authority of municipalities); TEX. GOV'T CODE ANN. §§ 551.001–.146 (codifying TOMA). GMS, which had provided commercial and industrial waste services to the City for numerous years, argued that the City's bidding and procurement process for a contract cycle was fatally flawed and resulted in the City's publication of GMS's confidential, proprietary information and the attempted award of a contract for these services to one of GMS's competitors. GMS sought a temporary restraining order and a temporary injunction.

That same day, the trial court granted GMS's application for a temporary restraining order in an ex parte proceeding. The court's order granting GMS's application provided, inter alia, that appellants were (1) prohibited from taking any action to interfere with or terminate GMS's existing commercial and industrial waste collection contract with

3

the City of Brownsville; (2) prohibited from taking any action to award or execute the City of Brownsville's commercial and industrial waste collection contract to or with Republic Services, Inc. (Republic), Redfish Recycling (Redfish), or any third party; (3) prohibited from performing any contract with Republic, Redfish, or with any third party for commercial and industrial waste collection; (4) ordered to produce documents and respond to the expedited discovery requests attached as exhibits to GMS's petition and served by GMS by May 13, 2019; and (5) ordered to appear for depositions to occur on or before May 17, 2019. The order sets GMS's application for temporary injunction to be heard before an assigned judge.

On May 24 and May 30, 2019, the assigned judge held evidentiary hearings on GMS's request for injunctive relief. The trial court heard testimony from: (1) Roberto Trevino, the manager and partial owner of GMS, (2) Roberto Luna, the director of purchasing and contract services for the City, (3) Jose Francisco Perez, the assistant director of the purchasing department for the City, and (4) commissioner De Leon. The following comprises a summary of the events giving rise to this lawsuit.

At the time of the hearings, GMS had provided commercial and industrial waste services to the City for approximately thirty years pursuant to request for proposal (RFP) processes taken under the procurement provisions of Chapter 252 of the Texas Local Government Code. *See* TEX. LOC. GOV'T CODE ANN. §§ 252.001–.063. In 2011, the City and GMS executed a five-year contract which expired in 2016. In 2016, when the contract expired, GMS and the City agreed to extend the contract on a month-to-month basis while the City instituted a new RFP process.

The City held a 2016 RFP process, and GMS, Redfish, and Republic submitted proposals. Pursuant to the 2016 RFP process, an evaluation committee ranked GMS's proposal the highest, so the City's management recommended that the City commissioners sign a contract with GMS; however, after tabling the award of the contract to GMS on two separate occasions, the City cancelled the RFP process and rejected all three proposals. At the hearing in this case, the City's attorney argued that the City did not have a ministerial duty to accept GMS's proposal, that it had the authority to reject all proposals under Chapter 252, and that it "has discretion to decide what's in the best interest of its waste management and to negotiate terms . . . ." After the 2016 RFP process failed, GMS continued providing commercial and industrial waste services to the City on a month-to-month basis under the 2011 contract terms.

Trevino provided specific testimony about GMS's participation in the 2016 RFP process. According to Trevino, the City asked GMS to continue providing services to the City through a six-month extension to enable the City to institute the process. The original deadline for this RFP was August 3, 2016, but that deadline was extended by the City on several occasions. The 2016 RFP states, under "applicable law," that it is a procurement process within § 252.042 of the local government code. Trevino testified that GMS relied on the fact that it was a competitive procurement process under Chapter 252 when it submitted its proposal. He further testified that, under the process, GMS was guaranteed that its bid would be confidential, and that its information would not be made public unless it was awarded the City's contract. The "proposal evaluation and selection" portion of this RFP allocates an "added value" score of twenty percent. Trevino testified that the "added

value" provided by GMS to the City included special clean-up activities, community events, and recycling opportunities.

Trevino testified that he was told that GMS had the successful proposal for the 2016 RFP, and that he began negotiating a new contract with, inter alia, Luna as the City's purchasing director. Trevino understood that they had reached an agreement regarding the terms of a contract. Trevino attended the December 13, 2016 commissioner's meeting where the GMS contract proposal, including its bidding information, was presented, along with its confidential pricing, in public open session. The commission voted to table the GMS contract proposal. Trevino subsequently attended the January 17, 2017 commissioner's meeting where De Leon stated that the GMS proposal was not sufficient and stated that he wanted to see the contract. The GMS proposal was then tabled a second time.

Before the March 7, 2017 commissioner's meeting, Luna sent GMS the contract, and Trevino testified that he signed it. At the commissioner's meeting, Luna was supposed to present the signed contract to the commissioners, but before that happened, De Leon moved to reject all the proposals, including the proposal from GMS, and that motion passed. At the time, there was no discussion regarding the rationale for that decision.

Luna drafted the 2016 RFP and specifically described its process. He testified that the 2016 RFP, including the proposal from GMS, was rejected after being tabled twice. According to Luna, GMS was the highest ranked firm for the 2016 RFP process, second was Republic, and third was Redfish. According to Luna, an independent evaluation committee considered and ranked the proposals. Ultimately, the evaluation committee

6

negotiated with GMS, presented a contract to GMS, and GMS signed that contract. In 2016, Luna thought that the RFP was a routine matter, and that the GMS contract would be approved. Luna stated that he presented the contract and a recommendation to proceed with it to the commission at its meeting in December 2016. Luna also provided the commission with a memorandum which included the GMS offer, including its pricing terms, which was shown at open session on a PowerPoint presentation.

According to Luna, the commission did not authorize the city manager to execute the GMS contract. According to the 2016 RFP process, the execution of the contract required action by the commission, and without action, "all that exists is a tentative agreement negotiated by the evaluation committee and the administration." On cross-examination, Trevino acknowledged that the tentative agreement proposed by City staff and signed by GMS was not finalized, and it needed to be approved by the City commission by majority vote. Trevino testified that the commissioners were not required to ratify GMS's agreement and that "nothing [was] guaranteed." He testified, however, that City staff did propose and recommend GMS's bid.

After the failure of the 2016 RFP, the City set a time frame for a second RFP and extended GMS's contract on a month-to-month basis. The City then held a 2017 RFP process. In March 2017, the previous assistant city manager Pete Gonzalez informed Luna by email that, essentially, the commissioners wanted more proposals and greater competition for the City's industrial and commercial waste contract. Luna thus concluded he needed to develop a different RFP that would allow for more competition. Therefore, for the 2017 RFP, Luna began utilizing IBIS World, a general procurement tool, which he described as a:

7

web-based database that helps communities or government entities, and they provide statistical information that can be used to put together RFPs. They give information as to what are the industry standards, what are the benchmark prices, what are the—in this case, the different types of services, how they are compared to other ones. And basically, it's statistical information that is helpful, in this case to us, purchasing, to better write our bid solicitations or RFPs or even the statements of qualifications.

Luna nevertheless testified that he derived the 2017 RFP evaluation criteria with his assistant, Perez, and a senior buyer, Alfonso Mendoza. The 2017 RFP again states that it is a procurement process under Chapter 252.

Despite the City's alleged efforts to obtain a greater pool of applicants, the same three companies—GMS, Redfish, and Republic—submitted proposals for the 2017 RFP. This time, the evaluation committee, utilizing the 2017 criteria, ranked the three proposals in order as those submitted by Redfish, Republic, then GMS. Thus, for the 2017 RFP, GMS scored the lowest under the new evaluation criteria.

The criteria used for the 2017 RFP radically changed the scoring for the applicant pool and directly affected GMS's ranking. Specifically, the 2017 RFP did not include an "added value" criterion, which was included in each of the previous RFPs, and on which GMS had always scored highly through its provision to the City of additional "clean-up" activities, recycling, and other services. Trevino testified that the removal of the "added value" criterion "killed" GMS's opportunity to be awarded the City's contract. The 2017 RFP also included a new criterion requiring the applicant to be engaged in other exclusive waste-disposal contracts; however, GMS had no other contracts and exclusively provided its services solely to the City. According to Trevino, this criterion "locked" GMS out from this RFP. Trevino stated that it appeared that the city manager was told to make these changes to the criteria after discussions with the commissioners. Trevino testified that a

8

full year of silence passed regarding the 2017 RFP and, during this period, GMS continued to provide services to the City on a month-to-month basis.

Perez testified that he prepared a procurement summary for the 2017 RFPs and stated that the summary was not presented in a commissioner's open meeting. Rather, the 2017 RFP discussions with the commissioners all occurred in executive sessions, including discussions about contract negotiations, the terms of various proposals, and financial terms.

Pursuant to the 2017 RFP, the City began negotiating with Redfish, which was the most highly ranked candidate under that RFP. However, the negotiations with Redfish broke down, and Redfish accused the City of changing the RFP process. Ultimately, Redfish lodged complaints against the City about the RFP process and further alleged open meetings violations.

Luna testified that the City thus stopped negotiating with Redfish and moved on to the second highest ranked firm—Republic—in February 2019. Luna testified that the RFP process provides that if the City cannot reach a mutual agreement with the highest ranked firm, it can go with the second highest ranked, and so on, or it can cancel the RFP and start the process anew. At this point, however, the City concluded that it was not required to utilize the RFP process, abandoned the process, and began negotiating with Republic directly to obtain a contract.

At the February 5, 2019 commissioner's meeting, there was a discussion about "awarding a contract to some unknown winner." None of the bidders knew the identity of the winner of the RFP process. According to Trevino, "no one knew what had just happened other than that [the commission] had instructed the City Manager to begin

9

negotiations with the winner." Trevino's general manager subsequently went to the city manager's office to determine what had occurred, and that was when GMS discovered that Republic had been selected and GMS was being asked to help with the transition for a six-month period. Trevino testified that the foregoing events were based on the 2017 RFP under Chapter 252.

Luna testified that he served as the director of purchasing and contract services for the City for twenty-one years and that during his tenure, the commercial and industrial solid waste contracts were held by GMS, and they were always reached as the result of an RFP process through Chapter 252 of the local government code. Luna testified that the City's residential solid waste collection contracts were also always reached as the result of an RFP process under the code. Trevino similarly testified that all the RFP processes that it had undergone with the City were subject to the Chapter 252 procurement processes.

At the conclusion of these hearings, the assigned judge took the matter under advisement. On May 30, 2019, the assigned judge signed an order granting GMS's notice for nonsuit and dismissed GMS's claims against Tetreau in her individual capacity without prejudice. On June 6, 2019, GMS filed a verified first amended petition and application for temporary injunction and permanent injunction. On June 13, 2019, after further proceedings, the assigned judge granted a temporary injunction against appellants.

This appeal ensued.

## II. STANDARD OF REVIEW

The majority recites the applicable standard of review for an order granting or denying a temporary injunction:

10

We review a trial court's order granting or denying a temporary injunction for abuse of discretion. *Henry v. Cox*, 520 S.W.3d 28, 33 (Tex. 2017); *Butnaru v. Ford Motor Co.*, 84 S.W.3d 198, 204 (Tex. 2002); *InterFirst Bank San Felipe v. Paz Constr. Co.*, 715 S.W.2d 640, 641 (Tex. 1986) (per curiam); *Super Starr Int'l, LLC v. Fresh Tex. Produce, LLC*, 531 S.W.3d 829, 838 (Tex. App.—Corpus Christi–Edinburg 2017, no pet.). We do not review or decide the underlying merits, and we will not disturb the order unless it is "so arbitrary that it exceed[s] the bounds of reasonable discretion." *Henry*, 520 S.W.3d at 33–34.

A trial court abuses its discretion if it rules in an arbitrary manner or without reference to guiding rules and principles. *Butnaru*, 84 S.W.3d at 211; *see Sargeant v. Al Saleh*, 512 S.W.3d 399, 409 (Tex. App.—Corpus Christi–Edinburg 2016, no pet.) (combined appeal & orig. proceeding). A trial court does not abuse its discretion if some evidence reasonably supports its decision. *Butnaru*, 84 S.W.3d at 211; *Marketshare Telecom, L.L.C. v. Ericsson, Inc.*, 198 S.W.3d 908, 916 (Tex. App.—Dallas 2006, no pet.). We draw all legitimate inferences from the evidence in the light most favorable to the trial court's decision. *Marketshare Telecom*, 198 S.W.3d at 916; *see also Concerned Citizens of Palm Valley, Inc. v. City of Palm Valley*, No. 13-20-00006-CV, 2020 WL 4812641, at *2–3 (Tex. App.—Corpus Christi–Edinburg Aug. 13, 2020, no pet.) (mem. op.).

Although the majority's statement of the standard of review is correct, the majority fails to apply this standard correctly in this case. GMS was not required to prove, at this stage, that it would prevail on final trial; instead, the only question before the trial court was "whether [GMS] was entitled to preservation of the status quo pending trial." *Shor v. Pelican Oil & Gas Mgmt., LLC*, 405 S.W.3d 737, 749 (Tex. App.—Houston [1st Dist.] 2013, no pet.). The effect of premature review of the merits denies appellants their right to trial by jury. *See Davis v. Huey*, 571 S.W.2d 859, 862 (Tex. 1978). Further, it is based on the mistaken assumption that the evidence taken at the preliminary hearings will be the same as the evidence developed at a full trial on the merits. *Id.* Here, the majority's opinion effectively applies a de novo standard to the issuance of a temporary injunction and substitutes its own opinion for that of the trial court.

11

### III.     OBJECTIONS TO ASSIGNED JUDGE

In their first issue, appellants argue that the assigned judge erred in granting a temporary injunction because the assigned judge was disqualified. I agree with the majority's analysis that Tetreau's objection to the assignment was untimely, and thus agree that appellants' first issue should be overruled.

### IV.     TEMPORARY RESTRAINING ORDER

In their second issue, appellants assert that the assigned judge erred in granting a temporary injunction because the underlying temporary restraining order was improperly entered. They assert that the temporary restraining order was void because, inter alia, the original trial judge knew that she was recused at the time that she signed the temporary restraining order, the order of recusal fails to state "good cause" for her ruling, and the trial court effectively appointed Judge Pate to hear the case before he was officially appointed by the Presiding Judge of the Fifth Judicial Administrative Region.

Appellants have not cited authority establishing that the foregoing sequence of events, albeit irregular, render the temporary restraining order void. In any event, the temporary restraining order stated that it would expire on May 20, 2019. Judge Pate extended the expiration date of the temporary restraining order from May 20, 2019, to May 30, 2019 by a separate order signed on May 15, 2019. The expiration of a temporary restraining order renders a challenge to it moot. *See Cascos v. Cameron Co. Atty.*, 319 S.W.3d 205, 220 (Tex. App.—Corpus Christi–Edinburg 2010, no pet.), *abrogated on other grounds by In re State Bd. for Educator Certification*, 452 S.W.3d 802 (Tex. 2014) (orig. proceeding); *Hermann Hosp. v. Tran*, 730 S.W.2d 56, 57 (Tex. App.—Houston [14th Dist.]

1987, no writ); *see also In re Tex. State Univ.*, No. 03-19-00364-CV, 2019 WL 2707971, at *1 (Tex. App.—Austin June 27, 2019, orig. proceeding) (mem. op.).

I would thus overrule the appellants' second issue.

## V.     NECESSARY ELEMENTS

In their third issue, appellants assert that the assigned judge erred in granting a temporary injunction because GMS failed to establish the necessary elements to obtain a temporary injunction. They assert that GMS failed to show a probable right to recovery, its claimed injunctive relief is based on speculative events, and its claimed relief usurps the City's police powers and the relief sought exceeds the status quo.

The majority concludes that appellants are correct. I disagree, and as discussed below, believe that the majority's analysis is flawed. It is abundantly clear that a court must not interpret a statute in a manner that renders any part of the statute meaningless or superfluous. *City of Dallas v. TCI W. End, Inc.*, 463 S.W.3d 53, 55–56 (Tex. 2015); *Crosstex Energy Servs, L.P. v. Pro Plus, Inc.*, 430 S.W.3d 384, 390 (Tex. 2014); *Columbia Med. Ctr. of Las Colinas, Inc. v. Hogue*, 271 S.W.3d 238, 256 (Tex. 2008). Here, the Legislature has granted statutory causes of action for violations of Chapter 252 of the Texas Local Government Code and TOMA. As I will discuss further, the majority's interpretation of these statutory causes of action renders them nugatory.

## A.     Probable Right to Recovery

Appellants first contend that GMS failed to show a probable right of recovery. They assert that GMS pleaded "no cause of action for which it can recover injunctive relief" and assert that if there is no subject matter jurisdiction over a cause of action, then the plaintiff is not likely to recover on the merits of this cause of action.

13

A temporary injunction may not issue unless the petitioner can show a probable right to recovery. *Butnaru*, 84 S.W.3d at 204. To establish a probable right to recovery, the applicant must establish it has a cause of action for which it may be granted relief. *See Walling v. Metcalfe*, 863 S.W.2d 56, 57–58 (Tex. 1993); *Reyes v. Burrus*, 411 S.W.3d 921, 924 (Tex. App.—El Paso 2013, pet. denied). The phrase "probable right of recovery" is a "term of art" in the injunction context. *Intercontinental Terminals Co. v. Vopak N. Am. Inc.*, 354 S.W.3d 887, 897 (Tex. App.—Houston [1st Dist.] 2011, no pet.); *see Frontera Generation Ltd. P'ship v. Mission Pipeline Co.*, 400 S.W.3d 102, 110 (Tex. App.—Corpus Christi–Edinburg 2012, no pet.).

To show a probable right to recovery, an applicant need not show that it will prevail at trial but instead must plead a cause of action and present some evidence that tends to sustain it. *Frontera Generation Ltd. P'ship*, 400 S.W.3d at 110; *Intercontinental Terminals Co.,* 354 S.W.3d at 897. The evidence must be sufficient to raise a bona fide issue as to the applicant's right to ultimate relief. *Frontera Generation Ltd. P'ship*, 400 S.W.3d at 110; *Intercontinental Terminals Co.,* 354 S.W.3d at 897. The trial court has broad discretion in determining whether the pleadings and evidence support a temporary injunction. *Frontera Generation Ltd. P'ship*, 400 S.W.3d at 110; *Intercontinental Terminals Co.,* 354 S.W.3d at 898.

In this case, GMS sought relief for violations of Chapter 252 of the Texas Local Government Code and TOMA and further sought declaratory relief in conjunction with those alleged violations. I will examine these causes separately.

### 1. Chapter 252

In its first amended petition, GMS asserted that appellants violated Chapter 252 of the Texas Local Government Code by failing to apply competitive bidding procedures to the City's award of its commercial and industrial waste collection contract and by failing to award the contract to the lowest responsible bidder or to the bidder who provides goods and services at the best value for the municipality. *See* TEX. LOC. GOV'T CODE ANN. § 252.021 (delineating the municipality's competitive requirements for purchases); *id.* § 252.043(a) (requiring a contract to be awarded to the lowest responsible bidder or to the bidder who provides goods or services at the best value for the municipality). Appellants make numerous arguments regarding why GMS lacks a probable right to relief sought under Chapter 252.

### a. Immunity

Appellants first contend that GMS's probable right to relief is defeated because the relief sought in its Chapter 252 claim is "barred by law/not ultra vires/no probable right of recovery." They assert that the court lacks subject matter jurisdiction over the Chapter 252 claims because "[GMS] did not and cannot plead nor show sufficient jurisdictional facts to support the claim against them in order to waive immunity."

Section 252.061 states, in relevant part, that if "a contract is made without compliance with this chapter, it is void and the performance of the contract, including the payment of any money under the contract, may be enjoined by . . . any property tax paying resident of the municipality." *Id.* § 252.061. This section waives a municipality's immunity. *See City of El Paso v. Waterblasting Techs., Inc.*, 491 S.W.3d 890, 897 (Tex. App.—El Paso 2016, no pet.); *City of New Braunfels v. Carowest Land, Ltd.*, 432 S.W.3d 501 (Tex.

15

App.—Austin 2014, no pet.). "If a party with standing under [§] 252.061 could not sue the municipality, the party would effectively be precluded from enjoining the contract's performance or enjoining payment of money under the contract, leading to the absurd result that the Legislature intended to grant the parties a right without a remedy." *City of El Paso*, 491 S.W.3d at 898. Thus, I would reject appellants' argument that immunity defeats GMS's probable right to recovery.

### b. Authority to Reject Bids and No Affirmative Relief

Appellants assert that Chapter 252 grants the City authority to reject all bids and does not authorize affirmative relief. *See* TEX. LOC. GOV'T CODE ANN. § 252.043 (stating that the "governing body may reject any and all bids"). Appellants' contention misconstrues GMS's arguments in this case. GMS does not contend that the City violated the local government code by rejecting its bid but instead by, inter alia, failing to comply with a competitive bidding process and by revealing its confidential bid information. Further, injunctive relief is specifically and expressly made available under the local government code. *See* TEX. LOC. GOV'T CODE ANN. § 252.061 (providing injunctive relief when a contract is made without complying with Chapter 252); *City of Austin v. Util. Assocs., Inc.*, 517 S.W.3d 300, 315 (Tex. App.—Austin 2017, pet. denied). Accordingly, I would reject this argument.

### c. Claimed Exemption from Chapter 252

Appellants assert that the City was not required to use the Chapter 252 process for waste management services. According to appellants, § 252.022(a)(2) specifically exempts the City from using the Chapter 252 process by providing that this chapter does not apply to an expenditure for "a procurement necessary to preserve and protect the

16

public health and safety of the municipality's residents." TEX. LOC. GOV'T CODE ANN. § 252.022(a)(2). Appellants contend that application of the § 252.022(a)(2) exemption to a license for waste management collection was upheld in *Browning-Ferris, Inc. v. City of Leon Valley*, 590 S.W.2d 729 (Tex. App.—San Antonio 1979, writ ref'd n.r.e.).

Our sister courts have presented varying analyses regarding whether or not a city that utilizes Chapter 252's competitive bidding processes, even when it is arguably exempt, can be held responsible for violations of that Chapter. *Compare In re Griffith*, 485 S.W.3d 529, 536 (Tex. App.—Houston [14th Dist.] 2015, no pet.) (appeal & orig. proceeding) (finding Chapter 252 inapplicable where a statutory exemption applied), *with City of Fort Worth v. Lane*, No. 02–11–00048–CV, 2011 WL 6415161 (Tex. App.—Dallas Dec. 22, 2011, no pet.) (mem. op.) (concluding that a City that implemented Chapter 252 procedures could be found to have violated those procedures). The appellants here invite us to decide on the ultimate merits of this issue, which is both inappropriate on review of a temporary injunction and is unsupported by the undeveloped record presented in this appeal. *See Frontera Generation Ltd. P'ship*, 400 S.W.3d at 110; *Intercontinental Terminals Co.,* 354 S.W.3d at 897. Accordingly, I would reject this contention.

### d.    GMS Lacks Standing, or its Claims are not Ripe

Appellants assert that there was no contract in place that would allow injunctive relief to be issued. They note that § 252.061 allows injunctive relief "[i]f the contract is made without compliance with this chapter." They assert that the lack of an executed contract means that GMS lacks standing under § 252.061, or that its claims would not be ripe until such a contract is in place.

17

When standing is conferred by statute, we must analyze the statute itself to determine whether the Legislature intended to confer standing on a particular party. *See, e.g.*, *Brown v. De La Cruz*, 156 S.W.3d 560, 563 (Tex. 2004) (providing that when a private cause of action is alleged to derive from a statutory provision, the court must ascertain the drafters' intent from the statute itself). It is the statute that provides the framework for the standing analysis, and the "standing analysis begins and ends with the statute itself." *Marauder Corp. v. Beall*, 301 S.W.3d 817, 820 (Tex. App.—Dallas 2009, no pet.); *see City of El Paso*, 491 S.W.3d at 900. We presume that the Legislature was aware of existing law when it enacted the statute. *In re Allen*, 366 S.W.3d 696 (Tex. 2012) (orig. proceeding) ("We presume the Legislature is aware of relevant caselaw when it enacts or modifies statutes."); *Kilgore Indep. Sch. Dist. v. Axberg*, 572 S.W.3d 244, 261 (Tex. App.—Texarkana 2019, pet. denied).

For a court to have subject matter jurisdiction over a case, the plaintiff's claims must be ripe. *Sw. Elec. Power Co. v. Lynch*, 595 S.W.3d 678, 683 (Tex. 2020). "Ripeness, like standing, is a threshold issue that implicates subject matter jurisdiction . . . , and like standing, emphasizes the need for a concrete injury for a justiciable claim to be presented." *Patterson v. Planned Parenthood of Hous. & Se. Tex., Inc.*, 971 S.W.2d 439, 442 (Tex. 1998) (citations omitted). Standing focuses on the question of who may bring an action, whereas ripeness examines when that action may be brought. *See id.* In determining whether a case is ripe, the focus is on whether the facts are sufficiently developed so that an injury has occurred or is likely to occur, rather than being contingent or remote. *Sw. Elec. Power Co.*, 595 S.W.3d at 683; *Waco Indep. Sch. Dist. v. Gibson*, 22 S.W.3d 849, 852 (Tex. 2000). If the plaintiff's claimed injury is based on contingent or

18

hypothetical facts, or upon events that have not yet come to pass, then the case is not ripe, and the court lacks subject matter jurisdiction. *Sw. Elec. Power Co.*, 595 S.W.3d at 683; *Gibson*, 22 S.W.3d at 852.

Under § 252.061, in relevant part, a "property tax paying resident of the municipality" can enjoin the performance of a contract, including the payment of any money, when the contract is made without compliance with Chapter 252. TEX. LOC. GOV'T CODE ANN. § 252.061. Chapter 252 contains multiple requirements for municipal contracting pertaining to notice, procedure, bidding, and confidentiality which pertain to contract formation issues and not executed contracts. *See*, *e.g.*, § 252.021.; *id.* § 252.041; *id.* § 252.049. Under a traditional analysis of the applicable law, which the Legislature would have been familiar with in enacting Chapter 252, we examine whether a claim is ripe by determining whether the facts are sufficiently developed so that an injury has occurred *or is likely to occur*, rather than being contingent or remote. *See Sw. Elec. Power Co.*, 595 S.W.3d at 683; *Waco Indep. Sch. Dist. v. Gibson*, 22 S.W.3d 849, 852 (Tex. 2000).

I would thus conclude that a claim may be ripe under § 252.061, whether or not there is a completed contract, when an injury is likely to occur in the contract formation process. In examining the structure of the statute, it would be inconsistent with the statute, not to mention inefficient, to require a tax-paying resident to delay filing suit until a contract has been formally executed when the contract formation cycle has been riddled with alleged violations of Chapter 252. Further, requiring a resident to wait until a contract has been executed imperils any cause of action under § 252.061 insofar as appellate courts have held that relief sought under this section is rendered moot when there has been

19

performance under the contract. *See City of El Paso*, 491 S.W.3d at 904; *see also Bland Indep. Sch. Dist. v. Blue*, 34 S.W.3d 547, 557–58 (Tex. 2000) (concluding that parties lacked standing to seek injunctive relief regarding payments for a construction project when the contract had been performed). I would thus reject appellants' contention that GMS's claims were not ripe. In reaching this conclusion, however, I would caution the parties that this would not constitute a ruling on the merits.

### e. Tax Paying Resident

Appellants assert that GMS did not plead or prove that it is a tax paying resident of Brownsville, and in relevant part, § 252.061 only creates a cause of action for a taxpaying resident of the municipality. The statute provides that a contract that is made "without compliance" with Chapter 252 may be enjoined by "any property tax paying resident of the municipality." TEX. LOC. GOV'T CODE ANN. § 252.061 Here, GMS's verified first amended petition states that it "maintains its principal place of business" in Brownsville, Texas and Bennett is a "resident of Brownsville" and is a "property tax paying resident of Brownsville." Trevino testified that GMS's equipment was taxed in Brownsville. Based on the foregoing, I would conclude that the assigned judge appropriately exercised its broad discretion to conclude that GMS fell within the statutory definition of a taxpaying resident of the City. *See Frontera Generation Ltd. P'ship*, 400 S.W.3d at 110; *Intercontinental Terminals Co.,* 354 S.W.3d at 897.

### f. Conclusion

Contrary to the majority, I would conclude that GMS has established that it has a cause of action under Chapter 252 for which it may be granted relief. *See Walling*, 863 S.W.2d at 57–58; *Reyes*, 411 S.W.3d at 924; *Frontera Generation Ltd. P'ship*, 400

S.W.3d at 110; *Intercontinental Terminals Co.,* 354 S.W.3d at 897. The majority reasons that § 252.043 of the local government code grants the City the authority to reject "any and all bids" and its decisions to do so in this case were essentially discretionary in nature, thus, GMS does not have a probable right to relief under Chapter 252.

I agree with the majority that the City could reject "any and all bids." The statute expressly states as such in § 252.043. *See* TEX. LOC. GOV'T CODE ANN. §§ 252.043. However, this case is not about the City's ability to reject bids but about the City's compliance, or lack thereof, with Chapter 252's requirements, including, inter alia, statutory provisions regarding the notice requirement, requests for proposals, and confidentiality, and its course of action in making a contract without meeting the statutory prerequisites. *See, e.g.*, *id.* §§ 252.041, 252.042, 252.043, 252.049. Section 252.061 states, in relevant part, that if "a contract is made without compliance with this chapter, it is void and the performance of the contract . . . may be enjoined by "any property tax paying resident of the municipality." *Id.* § 252.061. Accepting the majority's premise as true, then any violation of the statute would be excused based on the municipality's exercise of discretion and its right to "reject any and all bids." This interpretation of the statute renders the statutory remedy illusory. "And we do not attribute to the Legislature an intent to enact nonsensical statutes." *PlainsCapital Bank v. Martin*, 459 S.W.3d 550, 556 (Tex. 2015); *see* TEX. GOV'T CODE ANN. § 311.021(3) ("In enacting a statute, it is presumed that . . . a just and reasonable result is intended . . . .").

The majority further reasons that "the injunctive relief authorized by § 252.061 does not extend to the subject matter of the relief GMS seeks, which is calculated to secure the contract award for GMS upon the invalidation of the award to another entity." Here,

21

the majority's analysis is dependent on the ultimate merits of the underlying lawsuit and the remedies to be awarded if the lawsuit is successful, neither of which is at issue in the appeal of a temporary injunction. And, as acknowledged by the majority, "the *only* relief available under Chapter 252 is to bar performance of an improperly procured contract," and that relief is certainly within the penumbra of remedies sought by GMS. *See Butnaru*, 84 S.W.3d at 204.

## 2. TOMA

GMS alleged that appellants violated TOMA on multiple occasions by, inter alia, (1) failing to first properly convene in an open meeting before entering a closed executive session; (2) failing to give sufficient notice of matters to be discussed in executive session; (3) the presiding officer failing to publicly announce that a closed meeting would be held; (4) failing to identify the section or sections of TOMA under which the closed meeting would be held; and (5) discussing non-legal matters in closed executive sessions that were purportedly justified by invoking § 551.071(2) of the Texas Government Code. *See* TEX. GOV'T CODE ANN. §§ 551.071(2) (allowing a governmental body to consult privately with an attorney in specified situations).

Section 551.142(a) of the government code expressly provides that "[a]n interested person contract . . . may bring an action by mandamus or injunction to stop, prevent, or reverse a violation or threatened violation of this chapter by members of a governmental body." *Id.* § 551.142(a); *see Town of Shady Shores v. Swanson*, 590 S.W.3d 544, 554 (Tex. 2019). Thus, the statute "allows an interested person to seek an order to compel action, an order to prevent action or threatened action, or both if necessary." *Town of Shady Shores*, 590 S.W.3d at 554; *see Campbell v. Wilder*, 487 S.W.3d 146, 153–54

22

(Tex. 2016); *see also Burks v. Yarbrough*, 157 S.W.3d 876, 878–79 (Tex. App.—Houston [14th Dist.] 2005, no pet.). "[TOMA] thus contains a clear and unambiguous waiver of immunity from suits seeking injunctive and mandamus relief." *Town of Shady Shores*, 590 S.W.3d at 554; *see Carowest Land, Ltd. v. City of New Braunfels*, 615 S.W.3d 156, 158 (Tex. 2020) (per curiam). I would thus conclude that GMS's causes of action under TOMA are not barred by immunity.

Appellants contend that GMS failed to show any potential relief that would entitle it to a probable right of recovery under TOMA. They contend that the City did not take any actions based on either meeting for which GMS claimed violations, and there is nothing to void because the City has not entered a contract. According to appellants, the City voted to cancel all proposals from the second requests for proposals, and the City Commissioners voted to authorize the City manager to negotiate for a commercial waste collection contract. Appellants thus argue that GMS lacks any potential relief from the alleged TOMA violations and that the violations are moot because the City has corrected them.

I disagree with appellants' contentions. *See*, *e.g.*, *City of Farmers Branch v. Ramos*, 235 S.W.3d 462, 469–70 (Tex. App.—Dallas 2007, no pet.) (holding that the city's repeal of an ordinance allegedly promulgated in violation of TOMA did not moot the plaintiff's claims because the court could grant prospective relief, such as requiring the city to comply with TOMA in the future); *see also City of Richardson v. Gordon*, 316 S.W.3d 758, 762 (Tex. App.—Dallas 2010, no pet.). Here, GMS both sought and received prospective relief under TOMA. Thus, the City's alleged correction of its TOMA violations

23

does not render GMS's claims moot because there remains available potential remedial relief. *See Ramos*, 235 S.W.3d at 469.

The assigned judge heard evidence indicating that the City's commissioners had, in executive session, discussed a potential contract, the merits of contract proposals, and contract negotiations, which may have been in violation of TOMA. *See* TEX. GOV'T CODE ANN. § 551.002. I would conclude that the evidence was sufficient to raise a bona fide issue as to GMS's right to ultimate relief under TOMA. *See Frontera Generation Ltd. P'ship*, 400 S.W.3d at 110; *Intercontinental Terminals Co.,* 354 S.W.3d at 897.

The majority's reasoning regarding GMS's cause of action for a violation of TOMA is flawed. The majority asserts that "TOMA only allows for the voiding of actions which were approved in violation of TOMA" and that "there is no existing contract to declare void or enjoin under TOMA; therefore, GMS does not have a right to relief under TOMA." This analysis is inconsistent with, and renders meaningless, § 551.142(a) of the government code, which expressly provides that "[a]n interested person . . . may bring an action by mandamus or injunction to *stop*, *prevent*, or reverse a violation or *threatened* violation of this chapter by members of a governmental body." *Id.* § 551.142(a) (emphases added); *see Town of Shady Shores*, 590 S.W.3d at 554. The statute "allows an interested person to seek an order to compel action, an order to prevent action or threatened action, or both if necessary." *Town of Shady Shores*, 590 S.W.3d at 554; *see Campbell v. Wilder*, 487 S.W.3d 146, 153–54 (Tex. 2016); *see also Burks v. Yarbrough*, 157 S.W.3d 876, 878–79 (Tex. App.—Houston [14th Dist.] 2005, no pet.). The majority's opinion ignores the express text of the statute and the opinion's flawed analysis renders any statutory remedy meaningless.

24

### 3. Declaratory Relief

GMS also sought a declaratory judgment regarding the foregoing alleged violations of the government code and local government code. Appellants assert that GMS's declaratory relief claim is barred by immunity.

The Uniform Declaratory Judgment Act (UDJA), in pertinent part, allows a person whose rights are affected by a statute to "have determined any question of construction or validity arising under the [statute] and obtain a declaration of rights, status, or other legal relations thereunder." TEX. CIV. PRAC. & REM. CODE ANN. § 37.004(a). The UDJA "does not contain a general waiver of sovereign immunity, providing only a limited waiver for challenges to the validity of an ordinance or statute." *Town of Shady Shores*, 590 S.W.3d at 552–53. Claims requesting other types of declaratory relief are barred absent a legislative waiver of immunity with respect to the underlying action. *Id.* at 553; *Tex. Parks & Wildlife Dep't v. Sawyer Tr.*, 354 S.W.3d 384, 388–89 (Tex. 2011).

In *Town of Shady Shores*, the Texas Supreme Court held that TOMA does not waive governmental immunity from suit for declaratory judgment claims as a matter of law:

> [TOMA] . . . contains a clear and unambiguous waiver of immunity from suits seeking injunctive and mandamus relief. But while the Legislature has expressly authorized a suit for declaratory judgment against the government in other statutes, it has not done so in [TOMA]. Thus, [TOMA's] clear and unambiguous waiver of immunity does not extend to suits for declaratory relief.

590 S.W.3d at 554; *see Carowest Land, Ltd.*, 615 S.W.3d at 158. Similarly, the relief provided in Chapter 252 of the local government code does not include declaratory relief. *See* TEX. LOCAL GOV'T CODE ANN. § 252.061. Accordingly, I would conclude that GMS has

25

not shown a probable right to the declaratory relief sought. I would sustain appellants' third issue, in part, as it pertains to GMS's request for declaratory relief.

Here, the majority opinion fails to address the appellants' cause of action for declaratory relief, presumably because the trial court's temporary injunction does not mention it. However, if the judgment can be upheld on any legal theory supported by the evidence, "[w]e must uphold the judgment regardless of whether the trial court articulates the correct legal reason for the judgment." *Conseco Fin. Servicing Corp. v. J & J Mobile Homes, Inc.*, 120 S.W.3d 878, 880–81 (Tex. App.—Fort Worth 2003, pet. denied); *see Regal Entm't Group v. iPic-Gold Class Entm't, LLC*, 507 S.W.3d 337, 346 (Tex. App.—Houston [1st Dist.] 2016, no pet.). Further, an appellate court must "hand down a written opinion that is as brief as practicable but that addresses every issue raised and necessary to final disposition of the appeal." TEX. R. APP. P. 47.1. The majority's opinion improperly fails to address the declaratory judgment cause of action pleaded by appellants.

## B. Irreparable Injury

Appellants next contend that GMS did not show that it would sustain a probable, imminent, and irreparable injury in the absence of injunctive relief. Appellants argue that GMS did not show imminent harm because GMS's claims "were based entirely on speculative future contracts." Appellants also assert that GMS's damages were capable of calculation, and thus, not irreparable.

Probable injury includes elements of imminent harm, irreparable injury, and the absence of an adequate remedy at law for damages. *Washington DC Party Shuttle, LLC v. IGuide Tours*, 406 S.W.3d 723, 741 (Tex. App.—Houston [14th Dist.] 2013, pet. denied); *Law v. William Marsh Rice Univ.*, 123 S.W.3d 786, 792 (Tex. App.—Houston

26

[14th Dist.] 2003, pet. denied). Stated otherwise, to obtain injunctive relief, the applicant must prove that absent such relief, it will suffer imminent, irreparable harm. *Lightning Oil Co. v. Anadarko E&P Onshore, LLC*, 520 S.W.3d 39, 49 (Tex. 2017); *Butnaru*, 84 S.W.3d at 204. "But speculation is not enough." *Lightning Oil Co.*, 520 S.W.3d at 49; *see Frequent Flyer Depot, Inc.*, 281 S.W.3d at 227. Thus, fear and apprehension of a claimed injury are not sufficient to support a temporary injunction. *Fuentes v. Union de Pasteurizadores de Juarez Sociedad Anonima de Capital Variable*, 527 S.W.3d 492, 501 (Tex. App.—El Paso 2017, no pet.); *Fox v. Tropical Warehouses, Inc.*, 121 S.W.3d 853, 861 (Tex. App.—Fort Worth 2003, no pet.). The act to be enjoined must be more than speculative and the injury that flows from it must be more than conjectural. *Washington DC Party Shuttle, LLC*, 406 S.W.3d at 741.

In terms of appellants' contention that GMS's damages were speculative, GMS presented evidence that if the assigned judge did not enjoin appellants from failing to comply with the bidding process, GMS's business would be disrupted, and in fact devastated, during the interim before the trial on the merits. Trevino testified that if the temporary injunction were not granted, GMS would cease operations insofar as "GMS will cease to exist," and its operators would "have to shut it down." Trevino testified that approximately ninety-five percent of GMS's revenues were associated with servicing the commercial and industrial solid waste collection needs of Brownsville, and if the injunction were not granted, GMS would be required to lay off approximately forty employees who reside in Brownsville and to sell its equipment. *See Occidental Chem. Corp. v. ETC NGL Transp., LLC*, 425 S.W.3d 354, 364 (Tex. App.—Houston [1st Dist.] 2011, pet. dism'd) ("Texas courts have recognized that 'business disruptions' may result in irreparable harm

27

for which a temporary injunction is appropriate."); *Liberty Mut. Ins. Co. v. Mustang Tractor & Equip. Co.*, 812 S.W.2d 663, 666 (Tex. App.—Houston [14th Dist.] 1991, no writ) (stating that disruption of business can be irreparable harm and type of harm for which temporary injunction can issue); *Miller v. K & M P'ship*, 770 S.W.2d 84, 85, 87–88 (Tex. App.—Houston [1st Dist.] 1989, no writ) (affirming temporary injunction to prevent transfer of disputed stock shares and rejecting argument that appellees failed to show lack of adequate remedy at law); *see also Miller v. Talley Dunn Gallery, LLC*, No. 05-15-00444-CV, 2016 WL 836775, *8 (Tex. App.—Dallas Mar. 3, 2016, no pet.) (mem. op.) ("Disruption to a business can constitute irreparable harm.").

Appellants also contend that GMS is unable to show irreparable injury because it can be adequately compensated by damages. An injury is irreparable if damages would not adequately compensate the injured party or if the damages cannot be measured by any certain pecuniary standard. *Butnaru*, 84 S.W.3d at 204; *Walling*, 863 S.W.2d at 58; *Flamingo Permian Oil & Gas, L.L.C.*, 569 S.W.3d at 332; *Taylor Hous. Auth. v. Shorts*, 549 S.W.3d 865, 878 (Tex. App.—Austin 2018, no pet.); *Washington DC Party Shuttle, LLC*, 406 S.W.3d at 741; *Fox*, 121 S.W.3d at 857.

I disagree with appellants. Trevino asserted that if the City terminated GMS's contract and Republic took over the commercial waste collection, then "in terms of reputation, small towns, small companies, it's all we have." Trevino alleged that "[w]e shut down and our reputation is dead here, and it follows us. And good will customers, city staff, employees, promises we've made, those kinds of things go away." He testified that GMS would be unable to recover if it lost its reputation insofar as "you can never get your reputation back if you lose it."

28

Loss of goodwill and reputation can constitute irreparable harm. *Intercontinental Terminals Co.*, 354 S.W.3d at 895–96 ("The harm found by the trial court includes loss of goodwill and reputation in the marketplace. Threatened injury to a business's reputation and good will with customers is frequently the basis for temporary injunctive relief."); *Frequent Flyer Depot, Inc. v. American Airlines, Inc.*, 281 S.W.3d 215, 228 (Tex. App.—Fort Worth 2009, pet. denied); *see also GN Ventures v. Stanley*, No. 05-19-01076-CV, 2020 WL 5868282, at *9 (Tex. App.—Dallas Oct. 2, 2020, no pet. h.) (mem. op.). Thus, I would conclude that GMS presented some evidence of an irreparable injury.

Viewing the evidence in the light most favorable to the assigned judge's order, I would conclude that the assigned judge did not abuse its discretion by finding that GMS carried its burden of showing imminent and irreparable harm in the interim before the trial on the merits. *See Fox*, 121 S.W.3d at 857; *see also SBI Investments, LLC v. Quantum Materials Corp.*, No. 03-17-00863-CV, 2018 WL 1191854, at *6 (Tex. App.—Austin Mar. 8, 2018, no pet.) (mem. op.).

## C.    Status Quo

Appellants assert that the purpose of a temporary injunction is to preserve the status quo of the subject matter of suit pending trial on the merits. They assert that the status quo at the time of the injunction was that "the City had the lawful right to enter into a contract with the commercial waste collection provider of its choosing," and the "status quo allowed for the City to terminate [GMS's] contract" or fail to renew the month-to-month contract.

The Texas Supreme Court has defined the status quo as "being the last, actual, peaceable, non-contested status that preceded the pending controversy." *State v. Sw.*

29

*Bell Tel. Co.*, 526 S.W.2d 526, 528 (Tex. 1975); *see Hartwell v. Lone Star, PCA*, 528 S.W.3d 750, 759 (Tex. App.—Texarkana 2017, pet. dism'd). A temporary injunction maintains the status quo by preventing "any act of a party which would tend to render the final judgment in the case ineffectual." *Baucum v. Texam Oil Corp.*, 423 S.W.2d 434, 441 (Tex. App.—El Paso 1967, writ ref'd n.r.e.) (quoting *Moffitt v. Lloyd*, 98 S.W.2d 860 (Tex. App.—Waco 1936, no writ)); *see City of Dallas v. Wright*, 36 S.W.2d 973, 976–77 (Tex. 1931); *Hartwell*, 528 S.W.3d at 759. The continuation of illegal conduct cannot be justified as preservation of the status quo. *In re Newton*, 146 S.W.3d 648, 651 (Tex. 2004) (orig. proceeding); *Cook v. Tom Brown Ministries*, 385 S.W.3d 592, 599 (Tex. App.—El Paso 2012, pet. denied). "In an injunction case wherein the very acts sought to be enjoined are acts which prima facie constitute the violation of expressed law, the status quo to be preserved could never be a condition of affairs where the respondent would be permitted to continue the acts constituting that violation." *Hous. Compressed Steel Corp. v. State*, 456 S.W.2d 768, 773 (Tex. App.—Houston [1st Dist.] 1970, no writ). If the central question in the suit is whether the status quo is a violation of the law, that determination should generally be made with a full trial on the merits. *In re Newton*, 146 S.W.3d at 652; *Pharaoh Oil & Gas, Inc. v. Ranchero Esperanza, Ltd.*, 343 S.W.3d 875, 882 (Tex. App.—El Paso 2011, no pet.).

Under the last peaceable non-contested status which preceded the pending controversy, GMS provided waste services to appellants on a month-to-month basis. *State*, 526 S.W.2d at 528; *Hartwell*, 528 S.W.3d at 759. GMS has alleged that appellants have violated the law and that the appellants propose to implement acts taken as a result of those violations. *In re Newton*, 146 S.W.3d at 652; *Pharaoh Oil & Gas, Inc.*, 343 S.W.3d

at 882. Further, allowing the appellants to remove GMS as its waste service provider would render any final judgment ineffectual. *See Baucum*, 423 S.W.2d at 441.

Accordingly, I would reject appellants' interpretation of the status quo.

## D. Conclusion

I would conclude that GMS established the necessary elements to obtain a temporary injunction except as to its cause of action for declaratory judgment. Accordingly, I would sustain appellants' third issue, in part, as to GMS's request for declaratory relief, and would overrule the third issue in all other respects.

## VI. UNDUE HARDSHIP

In their fourth issue, appellants assert that the assigned judge erred in granting a temporary injunction that creates an undue hardship. Appellants argue:

> The Temporary Injunction issued creates an undue hardship on the City; its elected officials; and all tax-paying citizens of the City of Brownsville. It essentially stiff-arms statutory law regarding the City's ability to choose its preferred waste collection provider and forces upon the City a waste collection provider the City neither chose; nor was required to choose. This temporary injunction not only forces on the City a contract with Appellee; but also forces the City to pay Appellee for services that it is not required to perform. The injunctive relief is so broad, overreaching and harmful, it would allow GMS to simply stop providing its services completely; let the trash pile up; and the City would be enjoined from taking any action at all to cancel its agreement with GMS or use or hire any other provider to collect the waste.

> . . . .

> The [assigned judge] abused its discretion with this far-reaching and overly broad temporary injunction and failed to consider any balancing of equities. In fact, the only testimony elicited at the hearing that even approaches the effects of requiring the City to remain in a contract with GMS was from GMS who promised to provide good service. GMS testified as to its belief that it would suffer harm to its reputation due to the City's threatened conduct. But GMS introduced no evidence of demonstrated or potential loss on their part if the injunction was not granted. No City Defendant was questioned at the hearing about the effect to the City if an injunction was granted.

31

A waste collection contract has public health and safety concerns for citizens as set forth in the Texas Local Government Code, Section 252.022(a)(2). Furthermore, municipalities have discretion to enter into such a contract in the manner of their choosing in the best interest of its citizens and furthering the necessity of not having an open-ended contract with no consequences for noncompliance. There was no evidence provided or testimony elicited at the hearing on the basic terms of the status-quo contract, such as the consequences for leaving garbage on the streets uncollected. There was no discussion as to who or how the status quo contract would be monitored for compliance.

The [assigned judge] abused its discretion and exceeded its jurisdiction by ordering the City to enter into a month-to-month contract for waste collection involving public health and safety concerns that could not be terminated, and with new terms decided on by the [assigned judge] that did not involve monitoring for compliance. Such hardship on the City and its citizens outweighs any hardship to GMS. The injunction clearly does not meet the principles governing courts of equity, to balance the equities by weighing the harm or injury to both GMS and the City if the injunctive relief is granted/denied . . . .

(Internal citation and footnotes omitted). Here, appellants contend that the injunction causes an undue hardship because it eliminates the City's right to choose a waste provider, forces the City to pay GMS for services it is not required to perform, allows GMS to "simply stop providing its services completely," and prohibits the City from rectifying that possibility. In their reply brief, appellants also assert that harm is shown because the "City is handcuffed to this month-to-month contract with GMS, regardless of the quality of work performed by GMS. This is a clear undue burden on the City." Appellants thus assert that the assigned judge failed to weigh the relative harm to them if injunctive relief were to be granted. GMS asserts, in contrast, that the assigned judge appropriately balanced the equities based upon the record presented.

In considering an application for a temporary injunction, a trial court balances the equities between the parties as well as the resulting conveniences and hardships.

32

*Burkholder v. Wilkins*, 504 S.W.3d 485, 493 (Tex. App.—Corpus Christi–Edinburg 2016, no pet.); *Computek Computer & Office Supplies, Inc. v. Walton*, 156 S.W.3d 217, 220 (Tex. App.—Dallas 2005, no pet.); *Universal Health Servs., Inc. v. Thompson*, 24 S.W.3d 570, 578 (Tex. App.—Austin 2000, no pet.); *see In re Gamble*, 71 S.W.3d 313, 317 (Tex. 2002) (orig. proceeding) ("A request for injunctive relief invokes a court's equity jurisdiction."). We review the trial court's assessment of the balance of equities under an abuse of discretion standard, and we will reject an evidentiary challenge if the decision is based on conflicting evidence and some evidence in the record reasonably supports the trial court's decision. *See Butnaru*, 84 S.W.3d at 211; *Burkholder*, 504 S.W.3d at 493; *Layton v. Ball*, 396 S.W.3d 747, 753–54 (Tex. App.—Tyler 2013, no pet.); *Universal Health Servs.*, 24 S.W.3d at 579.

A trial court may consider whether significant or slight injury would result if the injunction were erroneously denied, and whether significant or slight injury would result if the injunction were erroneously granted. *Burkholder*, 504 S.W.3d at 493; *T.F.W. Mgmt., Inc. v. Westwood Shores Prop. Owners Ass'n*, 162 S.W.3d 564, 575 (Tex. App.—Houston [14th Dist.] 2004, no pet.); *Coastal Marine Serv. of Tex., Inc. v. City of Port Neches*, 11 S.W.3d 509, 515 (Tex. App.—Beaumont 2000, no pet.). "Consideration of the equities involves weighing the public interest against the injury to the parties from the grant or denial of injunctive relief." *Int'l Paper Co. v. Harris County*, 445 S.W.3d 379, 395 (Tex. App.—Houston [1st Dist.] 2013, no pet.); *see Hot Rod Hill Motor Park v. Triolo*, 276 S.W.3d 565, 568 (Tex. App.—Waco 2008, no pet.); *Triantaphyllis v. Gamble*, 93 S.W.3d 398, 401–02 (Tex. App.—Houston [14th Dist.] 2002, pet. denied). The harm to the public includes public convenience and necessity. *Int'l Paper Co.*, 445 S.W.3d at 395.

33

The assigned judge's order states in relevant part that:

The Court further finds that, unless a temporary injunction issues enjoining Defendants from (1) terminating GMS's contract, (2) executing a contract for commercial and industrial solid waste collection with Republic Services or any other party, GMS will suffer imminent, irreparable injury, loss and harm. Such a temporary injunction will maintain the status quo before the violations occurred, where GMS was on a month-to-month contract with Brownsville beginning in September 2016. Without a temporary injunction, the Court finds that GMS will be forced out of business and forced to lay off GMS's approximately 40 employees, and will suffer damage to its business, goodwill, reputation, and charitable efforts. The Court finds that these damages are irreparable because GMS will be forced out of business and cease to exist as a going concern if a temporary injunction is not granted.

The Court finds that there is no adequate remedy at law for these damages because they cannot be accurately calculated or measured. The Court further finds that Defendants will suffer no harm if a temporary injunction is issued. Instead, the Court finds that Brownsville will benefit from the requested relief [because] the terms of the existing GMS [contract] are more favorable to Brownsville than the terms of the proposed contract offered by Republic Services, and GMS has performed these commercial and industrial solid waste collection services for Brownsville for over 30 years and has been performing these services since 2016 under a month-to-month contract with Brownsville.

Trevino, the manager and one of the owners of GMS, provided testimony regarding this issue. Trevino testified that GMS was providing services on a month-to-month basis pursuant to the 2011 contract, and its rates had decreased under the 2016 bid. According to Trevino, the quality of the services that GMS provided to the City after its month-to-month service began did not change. Further, GMS did not change its level of maintenance or repair of its trucks and cans. Trevino testified that GMS "[had] not changed a thing." Trevino stated that GMS replaced equipment as the equipment became older or inoperable, so he had "been bringing in new equipment as needed." Trevino calculated that GMS spent $1,500,000 in equipment maintenance over the last three years and spent between $1,200,000 and $1,300,000 for equipment replacement and

34

containers for the City. He asserted that GMS's insurance and bonds remained in place during this period. He testified that GMS continued to "provide the level of service and commitment to the City that it always [had]," and its intent was to continue to maintain the status quo until the merits of the instant dispute were determined.

Trevino testified that if the temporary injunction were not granted, "GMS will cease to exist," and its operators would "have to shut it down." The witness testified that approximately ninety-five percent of GMS's revenues were associated with servicing the commercial and industrial solid waste collection needs of Brownsville. Trevino asserted that if the status quo was not maintained and the City terminated GMS's contract and Republic took over the commercial waste collection, then "in terms of reputation, small towns, small companies, it's all we have." Trevino alleged that "[w]e shut down and our reputation is dead here, and it follows us. And good will customers, city staff, employees, promises we've made, those kinds of things go away." He testified that GMS would be unable to recover if it lost its reputation insofar as "you can never get your reputation back if you lose it." Trevino stated that if the injunction were not granted, GMS would have to terminate approximately forty employees who reside in Brownsville and sell its equipment, which would no longer be serviced and taxed in Brownsville. Trevino agreed that there would be "zero harm" to appellants to maintain the status quo on a month-to-month basis.

Reviewing the assigned judge's assessment of the balance of equities under an abuse of discretion standard and the record evidence, I would conclude that the evidence reasonably supports the assigned judge's decision. *See Butnaru*, 84 S.W.3d at 211; *Burkholder*, 504 S.W.3d at 493; *Layton*, 396 S.W.3d at 753–54; *Universal Health Servs.*,

35

24 S.W.3d at 579. Appellants offered no evidence, other than speculation, that the City would suffer harm, or that public convenience and necessity would be impaired.

I would therefore overrule appellants' fourth issue.

## VII. RELIEF

In their fifth issue, appellants assert that the assigned judge erred in granting the temporary injunction because the relief granted exceeds the relief sought. Appellants assert that GMS asked the assigned judge for an injunction prohibiting them from entering a contract with their competitor, Republic, or any other third party "for five years from which the executed GMS contract pertained." They assert that the assigned judge prohibited appellants from executing or performing a contract for commercial or industrial solid waste collection services with any person or entity other than GMS, as requested in GMS's petition, but also (1) prevented appellants from terminating GMS's existing month-to-month contract for commercial and industrial solid waste collection with the City; (2) prevented appellants from conducting a request for proposal process or any similar process for commercial or industrial solid waste collection contract; (3) ordered GMS to provide services starting June 1, 2019, under its existing month-to-month contract with Brownsville based on those terms reflected in GMS's best and final offer presented at the Brownsville City Commission Meeting on December 13, 2016; and (4) ordered that all elected officials of the City of Brownsville and the City Secretary take an online TOMA training course. Appellants assert that GMS did not request this relief.

Where the injunctive relief granted exceeds the relief requested by the applicant in the petition, the trial court exceeds its jurisdiction. *Harbor Perfusion, Inc. v. Floyd*, 45 S.W.3d 713, 718 (Tex. App.—Corpus Christi–Edinburg 2001, no pet.); *RP&R, Inc. v.*

36

*Territo*, 32 S.W.3d 396, 401 (Tex. App.—Houston [14th Dist.] 2000, no pet.) (citing *Fairfield v. Stonehenge Ass'n Co.*, 678 S.W.2d 608, 611 (Tex. App.—Houston [14th Dist.] 1984, no writ)).

In its first amended petition, GMS asked the assigned judge to enter a temporary injunction preventing the City "from terminating GMS's existing contract, executing a contract for commercial and industrial waste collection with Republic Services or any other third party, and from conducting a request for proposal process or any similar process for a commercial or industrial solid waste collection contract."

I would conclude that items (1) and (2) in the assigned judge's order as detailed above are encompassed in GMS's pleadings. Appellants contend that GMS's pleadings failed to support the assigned judge's injunction preventing appellants from terminating GMS's existing month-to-month contract for commercial and industrial solid waste collection with the City; however, GMS's pleadings expressly ask the assigned judge to prevent the City "from terminating GMS's existing contract." Likewise, appellants contend that GMS's pleadings failed to support the assigned judge's injunction preventing appellants from conducting a request for proposal process or any similar process for commercial or industrial solid waste collection contract; however, GMS's pleadings expressly ask the assigned judge to prevent the City from "conducting a request for proposal process or any similar process for a commercial or industrial solid waste collection contract."

In item (3), the assigned judge ordered GMS to provide services starting June 1, 2019, under its existing month-to-month contract with Brownsville based on those terms reflected in GMS's best and final offer presented at the Brownsville City Commission

37

Meeting on December 13, 2016. GMS did not expressly request this relief; however, it is an order that merely implements relief that GMS explicitly requested. Further, item (3) imposes obligations only on GMS and not on appellants. "[A]n appealing party may not complain of errors that do not injuriously affect it or that merely affect the rights of others." *Torrington Co. v. Stutzman*, 46 S.W.3d 829, 843 (Tex. 2000); *see also Jordan v. Bustamante*, 158 S.W.3d 29, 39 (Tex. App.—Houston [14th Dist.] 2005, pet. denied).

Item (4) ordered that all elected officials of the City of Brownsville and the City Secretary take an online TOMA training course. GMS did not request this relief. At the hearing on the temporary injunction, appellants objected to the scope of the injunction. I would conclude that the relief ordered exceeded the relief sought as to item (4). *See Harbor Perfusion, Inc.*, 45 S.W.3d at 718; *RP&R, Inc.*, 32 S.W.3d at 401.

Therefore, I would overrule appellants' fifth issue in part as to items (1)–(3) and sustain it in part as to item (4).

## VIII.   UNCLEAN HANDS

In their sixth issue, appellants assert that the assigned judge erred in issuing a temporary injunction because GMS lacked clean hands. Appellants assert that, after the City did not enter a contract with GMS on March 7, 2017, GMS entered a month-to-month extension of its contract with the City and did not file suit until May 6, 2019, more than twenty-four months later. Appellants thus assert that GMS "did not come into court with clean hands [because it] failed to act promptly to enforce its 'right' to injunctive relief forcing a contract with the City." GMS argues, in contrast, that the unclean hands doctrine does not apply to its request for injunctive relief because appellants did not suffer harm and GMS acted promptly in seeking relief. GMS argues that it sought injunctive relief

38

against the City "less than a month after the City manager improperly selected Republic as the City's new commercial waste services provider." By reply, appellants assert that:

> [The City's] police powers and ability to engage in any search for a commercial waste collection provider of its choosing, and to select a commercial waste collection provider of its choosing have been totally destroyed. Further, the ability of the City to terminate a contract with GMS, that it otherwise could terminate, has been destroyed. The City is locked into a contract with GMS, regardless of GMS' performance and regardless of its own preference for the best waste collection for its residents. The City does not have to put on evidence in the form of testimony that it has been harmed. This is shown simply by virtue of the nature of the service at issue and the City's inability to exercise its governmental function(s).

The doctrine of "unclean hands" allows a court to "refuse to grant equitable relief, such as an injunction, in favor of "one whose conduct in connection with the same matter or transaction has been unconscientious, unjust, or marked by a want of good faith, or one who has violated the principles of equity and righteous dealing." *Park v. Escalera Ranch Owners' Ass'n, Inc.*, 457 S.W.3d 571, 597 (Tex. App.—Austin 2015, no pet.) (internal quotation marks and citations omitted); *see Cheniere Energy, Inc. v. Parallax Enters. LLC*, 585 S.W.3d 70, 84 (Tex. App.—Houston [14th Dist.] 2019, pet. dism'd); *Stewart Beach Condo. Homeowners Ass'n, Inc. v. Gili N Prop Invs., LLC*, 481 S.W.3d 336, 351–52 (Tex. App.—Houston [1st Dist.] 2015, no pet.). "A party seeking to invoke this equitable doctrine must show that he has been seriously harmed and the wrong complained of cannot be corrected without applying the doctrine." *City of Fredericksburg v. Bopp*, 126 S.W.3d 218, 221 (Tex. App.—San Antonio 2003, no pet.); *see Stewart Beach Condo. Homeowners Ass'n, Inc.*, 481 S.W.3d at 352.

Assuming without deciding that going on a month-to-month contract before filing suit violates "the principles of equity and righteous dealing" so as to fall within the unclean hands doctrine, a concept I view with some skepticism, I disagree with the argument that

39

this Court can merely assume that appellants have been harmed by GMS's failure to immediately seek relief. *See Park*, 457 S.W.3d at 597. Appellants point to nothing in the record to show that they have suffered any serious harm or that any alleged wrong cannot be corrected without applying the doctrine. In short, appellants have not shown that they are "seriously harmed" or that any "wrong complained of cannot be corrected without applying the doctrine." *See City of Fredericksburg*, 126 S.W.3d at 221. Further, the assigned judge's requirement that GMS post a bond protects appellants' interests, therefore, any "wrong complained of" has been "corrected" without applying the unclean hands doctrine. *Id.*; *see Stewart Beach Condo. Homeowners Ass'n, Inc.*, 481 S.W.3d at 351–52. Furthermore, to the extent appellants raise matters that are defensive in nature to the merits of GMS's claims, the assigned judge did not abuse its discretion in granting the injunction and reserving those matters to be determined along with the ultimate rights of the parties. *See Keystone Life Ins. Co. v. Marketing Mgmt., Inc.*, 687 S.W.2d 89, 93 (Tex. App.—Dallas 1985, no writ.); *see also HMS Holdings Corp. v. Pub. Consulting Grp., Inc.*, No. 05-15-00925-CV, 2016 WL 1179436, at *3 (Tex. App.—Dallas Mar. 28, 2016, no pet.) (mem. op.).

I would thus overrule appellants' sixth issue.

## IX. VOID

In their seventh issue, appellants argue that the injunctive relief order is void on its face because it fails to include a trial setting. Here, the assigned judge's June 13, 2019 order granting the temporary injunction does not set a trial date but instead sets the case for a "docket control conference" to be held on August 13, 2019. GMS asserts, in contrast, that the assigned judge corrected this error by issuing an order amending its temporary

injunction to specify a trial date of March 16, 2020. A supplemental clerk's record indicates that on August 13, 2019, the assigned judge granted GMS's motion to amend the temporary injunction to set a trial date and ordered that the temporary injunction order "be amended to set the trial on the merits of this cause to begin on March 16, 2020."

In relevant part, Texas Rule of Civil Procedure 683 requires every order granting a temporary injunction to: (1) set forth the reasons for its issuance; (2) be specific in terms; (3) describe in reasonable detail and not by reference to the complaint or other document, the acts sought to be restrained; and (2) include an order setting the cause for trial on the merits with respect to the ultimate relief sought. TEX. R. CIV. P. 683. Further, an applicant must "execute and file with the clerk a bond to the adverse party . . . [b]efore the issuance of the temporary restraining order or temporary injunction." *See id.* R. 684. The requirements of rules 683 and 684 are mandatory and must be strictly followed. *Qwest Commc'ns Corp. v. AT&T Corp.*, 24 S.W.3d 334, 337 (Tex. 2000) (per curiam); *InterFirst Bank San Felipe*, 715 S.W.2d at 641; *Caniglio v. Woods*, 593 S.W.3d 856, 858 (Tex. App.—Texarkana 2019, no pet.); *Taylor Hous. Auth. v. Shorts*, 549 S.W.3d 865, 880 (Tex. App.—Austin 2018, no pet.). If a temporary injunction fails to meet these requirements, it is to be declared void and dissolved by the reviewing court. *Qwest Commc'ns Corp.*, 24 S.W.3d at 337; *InterFirst Bank San Felipe*, 715 S.W.2d at 641; *Taylor Hous. Auth.*, 549 S.w.3d at 880; *Sargeant*, 512 S.W.3d at 409.

Here, the original temporary injunction that was signed on June 13, 2019, does not comply with the mandatory requirements of Rule 683 because it fails to set the case for trial but instead only sets a docket control conference. *See* TEX. R. CIV. P. 683. A temporary injunction that fails to set the case for trial on the merits is subject to being

41

declared void and dissolved. *See Qwest Commc'ns Corp.*, 24 S.W.3d at 337; *InterFirst Bank San Felipe*, 715 S.W.2d at 64*; Conway v. Shelby*, 432 S.W.3d 377, 381 (Tex. App.—Texarkana 2014, no pet.); *Conlin v. Haun*, 419 S.W.3d 682, 687 (Tex. App.—Houston [1st Dist.] 2013, no pet.); *see also Vantage Bank Tex. v. Gonzalez*, No. 13-19-00265-CV, 2020 WL 1615662, at *4 (Tex. App.—Corpus Christi–Edinburg Apr. 2, 2020, no pet.) (mem. op.); *Reiss v. Hanson*, No. 05-18-00923-CV, 2019 WL 1760360, at *2 (Tex. App.—Dallas Apr. 22, 2019, no pet.) (mem. op.).

Nevertheless, the assigned judge had the ability to correct this defect and did so with its subsequent August 13, 2019 order setting the case for trial. The assigned judge's amended order accomplishes the purpose of Rule 683. *Tex. Health & Human Servs. Comm'n v. Advocates for Patient Access, Inc.*, 399 S.W.3d 615, 623–24 (Tex. App.—Austin 2013, no pet.); *Eastern Energy, Inc. v. SBY P'ship*, 750 S.W.2d 5, 6 (Tex. App.—Houston [1st Dist.] 1988, no writ). In accordance with Texas Rule of Appellate Procedure 29.5, the assigned judge had authority to modify or amend the injunction order to (1) grant identical substantive relief, (2) grant additional substantive relief, and (3) bring the injunction into compliance with Rules 683 and 684 as long as those actions did not interfere with or impair this Court's jurisdiction, or the effectiveness of the relief appellants seek on appeal. *See Tex. Health & Human Servs. Comm'n*, 399 S.W.3d at 624.

Accordingly, I would overrule appellants' seventh issue.

## X.    CONCLUSION

I would reverse the trial court's temporary injunction regarding GMS's claims for declaratory relief, as discussed in issue three, and regarding the provision in the injunction requiring all elected officials of the City of Brownsville and the City Secretary to take an

42

online TOMA training course, as discussed in issue five. I would remand these matters for further proceedings consistent with this dissenting memorandum opinion. I would affirm the temporary injunction in all other respects.

GINA M. BENAVIDES
Justice

Delivered and filed the
6th day of May, 2021.

43